UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**
February 1, 2021 3:30 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: mkc  SCANNED BY: TB TPR

2/1/21

ANNE MARIE ANDERSON

    Plaintiff

v.

HOPE NETWORK,

    Defendants.

Case No: 1:21-cv-

HON.

**1:21-cv-111**
Robert J. Jonker
Chief U.S. District Judge

_____/

Stephen R. Drew (P24323)
Adam C. Sturdivant (P72285)
DREW COOPER & ANDING
Attorneys for Plaintiff
80 Ottawa Avenue NW, Suite 200
Grand Rapids, Michigan 49503
Phone: (616) 454-8300
Email: sdrew@dca-lawyers.com
Email: asturdivant@dca-lawyers.com

_____/

THERE IS NO OTHER CIVIL ACTION BETWEEN THESE PARTIES ARISING OUT OF THE SAME TRANSACTION OR OCCURRENCE AS ALLEGED IN THIS COMPLAINT PENDING IN THIS COURT, NOR HAS ANY ACTION BEEN PREVIOUSLY FILED AND DISMISSED OR TRANSFERRED AFTER HAVING BEEN ASSIGNED TO A JUDGE.

## COMPLAINT AND JURY DEMAND

## COMPLAINT AND JURY DEMAND

Plaintiff, Anne Marie Anderson, by and through her attorneys, DREW COOPER & ANDING, states as follows:

## JURISDICTION

1. This is an action for violation of the retaliation provision of the False Claims Act, 31 U.S.C. § 3729, *et seq*, the Michigan Medicaid False Claims Act, MCL§ 400.610c, and for claims of retaliatory discharge in violation of the public policy of the State of Michigan against Defendant.

2. The federal subject matter jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331 because this action is brought for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq*. (as amended), a federal statute.

3. This Court also has subject matter jurisdiction as the parties are completely diverse from one another. 28 U.S.C. §1332(a).

4. The Court has subject matter jurisdiction over the common law claim pursuant to 28 U.S.C. § 1345.

5. The Court has personal jurisdiction over Defendant because Defendant is a resident of and is licensed to transact and does transact business in this District, and has carried out violations of the False Claims Act in this District.

6. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

7. This Complaint has been filed within the period prescribed by 31 U.S.C. §§3731(b) and 3730(h)(3).

8. This is an action seeking declaratory and injunctive relief and money damages against Defendant Hope Network.

9. The unlawful and discriminatory employment practices alleged in this Complaint occurred within the Western District of the State of Michigan, therefore venue is proper in the United States District Court for the Western District of Michigan, pursuant to 28 U.S.C. § 1391 (b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## PARTIES AND KEY INDIVIDUALS AND GROUPS

10. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

11. Plaintiff Anne Marie Anderson is a citizen of the United States of America, and a resident of the State of California, but was at all relevant times a resident of the City of Ada, County of Kent, which is within the territorial limits of the United States District Court for the Western District of Michigan.

12. Plaintiff was at all relevant times employed by Defendant Hope Network.

13. Defendant Hope Network is a duly licensed nonprofit corporation qualified to do business in Michigan and was at all relevant times conducting business within the city of Grand Rapids, County of Kent, which is within the territorial limits of the United States District Court of the Western District of Michigan.

14. Defendant Hope Network was at all relevant times the company that employed Plaintiff Anderson.

15. Defendant Hope Network's corporate structure includes a Board of Trustees, and under the Board of Trustees, Affiliate Boards and Corporate Committees such as the Audit Committee and Compliance Committee.

16. The Chief Executive Officer and President for Defendant Hope Network served on several of Defendant Hope Network's Affiliate Boards.

17. The Chief Financial Officer and/or Chief Strategy Officer for Defendant Hope Network or Defendant Hope Network's Affiliate Boards served on the Compliance Committee.

18. Plaintiff's direct supervisor varied during her employment but included General Counsel, CEO, CFO, and Chief Administrative Officer for Defendant Hope Network.

## FACTUAL BACKGROUND

18. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs

19. On September 6, 2016, Anne Marie Anderson was hired by Defendant Hope Network to serve as the Corporate Compliance Officer ("CCO").

20. In her position as the CCO, her primary responsibilities included, but were not limited to:
    a. overseeing Hope Network's health care compliance program to prevent illegal, unethical, or improper conduct;
    b. reviewing and evaluating corporate policies and procedures and respond to compliance issues and concerns with Hope Network; and,
    c. ensuring that the Hope Network Board of Trustees, management, and employees were in compliance with federal and state health care laws and regulations, accrediting agencies, and contracts.

21. Plaintiff's direct supervisor varied during her employment but included General Counsel, CEO, CFO, and Chief Administrative Officer for Defendant Hope Network.

22. In Plaintiff's position as the CCO, Plaintiff made reports to Defendant Hope Network's Audit Committee and Compliance Committee, as well as Defendant Hope Network's Board of Trustees.

23. Defendant Hope Network's Audit Committee consisted of approximately four members including, but not limited to Hope Network's Board Treasurer.

24. At times, the Board Chair also attended the Audit Committee meetings.

25. Defendant Hope Network's Compliance Committee consisted of several members including, but not limited to the Chief Strategy Officer, Chief Healthcare Officer, Chief Financial Officer, General Counsel, Senior Vice President of Human Resources, Chief Information Officer (whose title later changed to the Chief Administrative Officer), and the Chief Operating Officer.

26. In June 2017, Defendant Hope Network began a "Repayment Audit" involving an internal team, outside counsel, and external auditors.

27. The Repayment Audit was intended, among other objectives, to identify payments owed to Medicare.

28. Plaintiff was a member of the internal Hope Network team involved in the Repayment Audit.

29. In January 2018, Plaintiff provided a comprehensive annual report to Defendant Hope Network's Board of Trustees Audit Committee.

30. In the report, Plaintiff also reported to the Audit Committee that none of the claims identified by the Billing Integrity Auditors had been repaid.

31. At a follow up meeting in March 2018, Plaintiff provided updates on her January 2018 report.

32. At the March 2018 meeting, members of Defendant Hope Network's Board of Trustees agreed that repayment needed to be made.

33. Between March 2018 and June 2018, Defendant Hope Network's Board of Trustees authorized an accrual while the repayment amount was being determined.

34. The amount of the repayment was determined on or around June 19, 2018 totaling in excess of $230,000.

35. Plaintiff was scheduled to provide a status report to Defendant Hope Network's Board of Trustees in July 2018.

36. Shortly before the meeting, Plaintiff's report was pulled.

37. To the best of Plaintiff's knowledge, understanding, and recollection, repayment was supposed to be made within 30 days of identifying the repayment amount in order to avoid fines and penalties.

38. Plaintiff was concerned that Hope Network was potentially generating thousands of dollars of penalties per violation as well as other associated fines.

39. To the best of Plaintiff's knowledge, understanding, and recollection, repayment was delayed from the finding of the amount of repayment.

40. In November 2018, Plaintiff detailed to members of Hope Network's leadership team, including the CEO, CFO, ongoing issues involving enrollment, and Defendant Hope Network's failure to accurately report changes to the managing and controlling interests for each billing organization to the government through its Provider Enrollment, Chain and Ownership System ("PECOS") and Medicaid enrollment systems. The issues discussed in

November 2018 constituted violations of the Medicare and Medicaid Fraud Waste and Abuse requirements.

41. The issues discussed in November 2018 had been previously reported by Plaintiff to Defendant Hope Network.

42. In March 2019, Plaintiff reported issues with autism billing codes to Defendant Hope Network's CEO.

43. Also in March 2019, Plaintiff reported issues with the Substance Use Disorder ("SUD") service provision and SUD felony violations to Defendant Hope Network Board of Trustees Compliance Committee Chairperson.

44. Between March 2019 and January 2020, Plaintiff continued to raise issues regarding repayment and improper billing practices and other acts that constituted violations of the False Claims Act.

45. Defendant Hope Network failed to take prompt and timely action in response to the violations that Plaintiff reported between March 2019 and January 2020.

46. On January 21, 2020, Plaintiff reported possible illegal billing activity to Defendant Hope Network's Audit Committee.

47. Plaintiff presented a PowerPoint presentation that included information regarding the illegal billing activity.

48. Some of the slides included specific information regarding the audit findings.

49. Plaintiff informed Defendant Hope Network's Audit Committee that she'd identified outstanding billing integrity audit findings on claims that had not been repaid exceeding $500,000.00.

50. The billing integrity audit findings included Medicare and Medicaid overpayments.

51. The overpayments identified in the January 21, 2020, presentation were on hundreds, if not thousands, of individual Medicare or Medicaid claims and billing violations.

52. At the meeting on January 21, 2020, Plaintiff informed Defendant Hope Network's Audit Committee that a similar violation for another company had resulted in a $2,300,000.00 fine as a result of False Claim Act violations.

53. Using that example, Plaintiff also pointed out to Defendant Hope Network's Audit Committee that the $2,300,000.00 fine and resulting settlement payment was greater than ten percent (10%) of that company's annual income.

54. Plaintiff intended to provide details and answer questions regarding her Audit committee Compliance Report to Defendant Hope Network's Board of Trustees in their executive session on January 22, 2020.

55. Plaintiff was not invited to the executive session, and was consequently unable to provide details or answer questions for the Board members.

56. Shortly thereafter, Plaintiff Anderson was out of the office for a pre-planned and pre-approved vacation.

57. Plaintiff Anderson returned to work on January 28, 2020.

58. In a one-on-one meeting with her supervisor, Plaintiff inquired into the status of the report she had given to the Audit Committee on January 21, 2020.

59. Plaintiff was not provided with any update on the status of her report by her supervisor or anyone on Defendant Hope Network's Audit Committee.

60. To the best of Plaintiff's knowledge, understanding, and belief, no action had been taken in response to the report she provided on January 21, 2020 during the time she was away from the office.

61. On January 30, 2020, Plaintiff Anderson was advised by her supervisor that Defendant Hope Network wished to terminate her employment.

62. Plaintiff was not given a reason for Defendant's decision to terminate her employment.

63. Plaintiff Anderson's employment was officially terminated on February 6, 2020.

64. Plaintiff believes her termination was in retaliation for reporting violations of the False Claims Act as well as other related statutes and regulations.

### COUNT I

### VIOLATION OF THE RETALIATION PROVISION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3730

65. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

66. The retaliation provision of the False Claims Act ("FCA") protects any employee, contractor or agent from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

67. Relief for violating 31 U.S.C. § 3730(h)(1) includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* § 3730(h)(2).

68. On numerous occasions, Plaintiff engaged in lawful acts, as set forth in more detail above, in efforts to stop one (1) or more violations of the FCA, including but not limited to

violations Plaintiff Anderson reported between May 2018 and January 2020 including but not limited to:

a. 31 U.S.C. §3729(a)(1)(A) (false claims) and 31 U.S.C. §3729(a)(1)(G) (reverse false claims) by:

   i. retaining money paid for claims that should have been repaid to Medicare and Medicaid;

   ii. billing for overlapping service; and,

   iii. billing for services not supported by documentation;

b. 31 U.S.C. §3729(a)(1)(B) (false records or statements) by:

   i. producing or maintaining documentation that did not support claims;

   ii. failing to update or correct Medicare and Medicaid enrollment;

c. 31 U.S.C. §3729(a)(1)(D)(conversion) by:

   i. retaining money paid for claims that should have been repaid to Medicaid and Medicare;

d. 42 U.S.C. §1320a-7b(b)(2) (anti-kickback violations) by:

   i. Providing services without reimbursement;

   ii. Providing administrative services for payers without reimbursement;

   iii. Forgiving reimbursement from individuals without establishing any charity policy or financial controls;

   iv. Automatic write-offs of copays and charges; and,

   v. Improperly billing autism claims to insurers and persons served (for their copayments and deductibles).

69. Because of the foregoing violations, as well as others, the certifications Defendant provided with each of the claims it submitted to Medicare – that Defendant complied with all Medicare laws, regulations, and program instructions – was fraudulent and false, rendering each such claim fraudulent and false.

70. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

71. Plaintiff cannot at this time identify each and every false claim for payment that was caused by Defendant's conduct, as the claims have been presented by several separate entities and Plaintiff does not have access to the records of all such false or fraudulent statements, records or claims.

72. Plaintiff was subsequently retaliated against, terminated and retaliated against post-termination due to their protected activity.

73. As a direct and proximate cause of Defendant's conduct of improperly retaliating against, investigating and terminating Plaintiff, she has suffered damages including, but not limited to, loss of her job and income, loss of career opportunities, emotional distress, including, but not limited to, embarrassment, humiliation and outrage.

## COUNT II

### VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT, MCL § 400.610c

74. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

75. The Michigan Medicaid False Claims Act ("Michigan Medicaid FCA") is an act "to prohibit fraud in the obtaining of benefits or payments in connection with the medical

assistance program; to prohibit kickbacks or bribes in connection with the program; to prohibit conspiracies in obtaining benefits or payments; . . . to provide for civil actions to recover money received by reason of fraudulent conduct; . . . to prohibit retaliation; to provide for certain civil fines; and to prescribe remedies and penalties." Michigan Medicaid False Claim Act 72 of 1977. (Emphasis added).

76. Additionally, "[a]n employer shall not discharge, demote, suspend, threaten, harass, or in any other manner, discriminate against an employee in the terms and conditions of employment because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act." MCL § 400.610c.

77. An employer who violates this section is liable to the employee for all of the following:

   a. Reinstatement to the employee's position without loss of seniority;

   b. Two times the amount of lost back pay;

   c. Interest on the back pay;

   d. Compensation for any special damages; and,

   e. Any other relief necessary to make the employee whole. MCL § 400.610c(2).

78. Over Plaintiff's stated reports and objections, Defendant, through its own acts or the acts of its officers, knowingly made, used or caused to be made or used, a false statement or false representation of a material fact in an application for Medicaid benefits to get false or fraudulent claims paid or approved by the State of Michigan in violation of MCL § 400.603(1).

79. Plaintiff cannot at this time identify every false statement or false representation of a material fact made in applications for Medicaid benefits that was caused by Defendant's

conduct, as the applications have been made by several separate entities and Plaintiff does not have access to the records of all such false or fraudulent statements, records, claims or applications.

80. Plaintiff took lawful acts in furtherance of an action under the Michigan Medicaid FCA with regard, but not limited to, MCL § 400.603. She, on numerous occasions, reported and objected to Defendant's violations of this Act, as set forth in more detail above.

81. Defendant and others associated with Defendant Hope Network retaliated against Plaintiff and terminated her employment due to her reports of violations of the Michigan Medicaid FCA.

82. Such conduct was in violation of the Michigan Medicaid False Claims Act, MCL §400.610c.

83. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendant, made full payments, which resulted in its being damaged in an amount to be determined.

84. As a direct and proximate cause of Defendant's conduct of improperly retaliating against, investigating and terminating Plaintiff, she has suffered damages including, but not limited to, loss of her job and income, loss of career opportunities and emotional distress, including, but not limited to, embarrassment, humiliation and outrage.

## COUNT III

### RETALIATORY DISCHARGE IN VIOLATION OF PUBLIC POLICY AGAINST DEFENDANT

85. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

86. As described above, Plaintiff exercised her rights and otherwise engaged in protected activity by exercising her responsibility to raise concerns, both verbally and in writing, and refusing to acquiesce in violations, or suspected violations, of state and/or federal laws related to federal health care programs and state and/or federal laws, as set forth above.

87. In addition, Defendant must meet the minimum standards and rules of the Michigan Public Health Code and must endeavor to carry out practices that will further protect the public health and safety, prevent the spread of disease, alleviate pain and disability, and prevent premature death.

88. By virtue of the acts described in the preceding paragraphs, Defendant has violated the Michigan Public Health Code and Plaintiff refused to acquiesce in the violations.

89. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendant has been damaged in an amount to be determined.

90. Defendant, through their agents, servants, or employees, violated the public policy of the State of Michigan by retaliating against Plaintiff and terminating her for engaging in the above referenced protected activity.

91. Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

92. The temporal proximity between Plaintiff's protected activity and Defendant's materially adverse employment action is also a clear indicator of retaliatory conduct.

## DAMAGES AND RELIEF REQUESTED

93. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

94. As a direct and/or proximate result of the aforementioned actions and inactions by Defendant, Plaintiff sustained injuries including but not limited to, mental anguish, fright, shock, embarrassment, humiliation, mortification, damage to reputation, disruption of personal life, loss of enjoyment of the ordinary pleasures of living, possible loss of earning capacity, and other damages known and unknown.

95. As a direct and/or proximate result of the aforementioned actions and inactions by Defendant, Plaintiff has been deprived of wages, loss of income, earning capacity, and other employment benefits, including, but not limited to, prospective retirement benefits, other insurance coverage, holiday and vacation pay, social security insurance, training opportunities, other promotional benefits, other fringe benefits, and, other damages known and unknown, causing Plaintiff to suffer considerable financial distress and hardship.

## LEGAL RELIEF

96. Economic, noneconomic, and compensatory damages in whatever amount they are found to be entitled;

97. Exemplary damages in whatever amount they are found to be entitled;

98. Punitive damages in whatever amount they are found to be entitled;

99. Liquidated damages, treble damages, and double damages in whatever amount they are found to be entitled; and,

100. An award of interest, costs and reasonable attorney fees.

## EQUITABLE RELIEF

101. An order from this Court placing Plaintiff in the position she would have been in had there been no wrongdoing by Defendant's, including reinstatement with back pay.

102. An injunction from this Court prohibiting any further acts of wrongdoing;

103. An award of interest, costs, and reasonable attorney fees; and,

104. Whatever other equitable relief appears appropriate at the time of final judgment.

WHEREFORE, Plaintiff, Anne Marie Anderson, seeks all appropriate damages against Defendant Hope Network arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact award Plaintiff all applicable damages, including but not limited to compensatory, exemplary, and/or punitive and all other relief arising out of law, equity and fact according to statutory and common law, including interest, costs, and attorney fees.

Respectfully submitted,

Dated: February 1, 2021

By: _____
Stephen R. Drew (P24323)
Adam C. Sturdivant (P72285)
DREW COOPER & ANDING
Attorneys for Plaintiffs
80 Ottawa Avenue NW, Suite 200
Grand Rapids, Michigan 49503
Phone: (616) 454-8300
E-mail: sdrew@dca-lawyers.com
E-mail: asturdivant@dca-lawyers.com

## JURY DEMAND

Plaintiff Anne Marie Anderson, by and through her attorneys, DREW COOPER, & ANDING, hereby demands a trial by jury on all claims set forth above.

Dated: February 1, 2021

By: _____
Stephen R. Drew (P24323)
Adam C. Sturdivant (P72285)
DREW COOPER & ANDING
Attorneys for Plaintiffs
80 Ottawa Avenue NW, Suite 200
Grand Rapids, Michigan 49503
Phone: (616) 454-8300
E-mail: sdrew@dca-lawyers.com
E-mail: asturdivant@dca-lawyers.com



USPS TRACKING

9114 9023 0722 4051

Law
DREW COOP
ATTORNEYS A
ALDRI
80 OTTAWA AVEN
GRAND RAPID

DREW, COO
ATTN: RO
80 OTTAWA
GRAND RA

